Edward NEKOLNY, Patrick Dumas, and
Maria L. Dahms, Plaintiffs-Appellees,

v.

Ann B. PAINTER, Individually and as
Supervisor of Lyons Township,
Defendant-Appellant.

No. 80–1731.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1981.

Decided July 13, 1981.

As Amended Aug. 14, 1981.

Rehearing and Rehearing En Banc
Denied Nov. 2, 1981.

Cudahy, Circuit Judge, concurred with
an opinion.

George C. Pontikes, Foss, Schuman & Drake, Chicago, Ill., for defendant-appellant.

Dan Walker, Jr., Oak Brook, Ill., for plaintiffs-appellees.

Before SWYGERT,* Senior Circuit Judge, and WOOD and CUDAHY, Circuit Judges.

SWYGERT, Senior Circuit Judge.

This appeal involves the First Amendment rights of three Lyons Township employees who were found by a jury to have lost their jobs because they had campaigned for the Township Supervisor's opponent in an election. The defendant-appellant Supervisor alleges as error the district court's allocation of the burden and standard of proof; the directed verdict finding that the Senior Citizens' Coordinator was not a policymaker; the denial of immunity to the defendant in her individual capacity and the denial of qualified immunity; the admission of testimony as to statements made by the defendant's "liaison"; and the award

---

* At the time of oral argument, Judge Swygert was a circuit judge in active service; he assumed senior status on July 1, 1981.

of damages for mental and emotional distress. It is also contended that the verdicts were against the manifest weight of the evidence.

We affirm the judgments of the district court as regards plaintiffs Nekolny and Dahms, except for the damages awarded for mental and emotional distress to all three plaintiffs which are reversed for lack of a sufficient foundation in the record. We also hold that the directed verdict finding plaintiff Dumas not to be a policymaker was error. Accordingly we remand for a determination by the trier of fact according to the standards we have set forth in this opinion.

## I

Ann Painter, a Republican and the defendant in this lawsuit, took office as Supervisor of Lyons Township on April 18, 1977. All three plaintiffs were at that time employed by Lyons Township, each having been hired during the term of the previous Supervisor. Plaintiff Edward Nekolny was a bus driver for the Senior Citizens' Bus Service; plaintiff Patrick Dumas was the Senior Citizens' Coordinator, and plaintiff Maria Dahms was a Secretary-Dispatcher. Within six weeks of Painter's incumbency, all three had lost their jobs, although the defendant asserted that Dahms had resigned voluntarily. Each plaintiff had campaigned vigorously for the defendant's opponent, a member of the Bipartisan Party, and against the defendant in the election for Supervisor.

Plaintiffs brought their action under 42 U.S.C. § 1983, alleging that defendant Painter had violated their constitutional rights to freedom of speech and association under the First and Fourteenth Amendments of the United States Constitution by terminating them or forcing them to resign from their positions with Lyons Township because of their campaign activity on behalf of her political opponent. Defendant took the position that Nekolny was dismissed because of health problems and concern for the safe transporting of senior citizens, that Dumas' position was abolished in keeping with defendant's campaign promise to eliminate the four top-paying appointed positions within the Township government, and that Dahms had voluntarily resigned on being informed that due to a reassessment of program needs, her work load and pay would be decreased. Nekolny and Dahms testified that James Hickey, then defendant's liaison to the Senior Citizens' Bus Service, told them that the defendant wanted to terminate them because they had campaigned against her. Hickey denied making those statements. Although it was not disputed that Painter had made a campaign pledge to abolish four positions including that held by Dumas, it was also clear that after terminating Dumas, Painter named Hickey the new Senior Citizens' Coordinator, albeit at a reduced salary.

A jury trial on the issue of liability resulted in a verdict for the plaintiffs. Damages were assessed by the jury as follows: for Nekolny, $40,000 in lost earnings and fringe benefits, $5,000 for mental and emotional stress and $5,000 for punitive damages; for Dumas, $12,000 in lost earnings and fringe benefits, $13,000 for additional expenses, $2,500 for mental and emotional distress and $5,000 for punitive damages; for Dahms, $17,000 in lost earnings and fringe benefits, $2,500 for emotional and mental distress and $5,000 for punitive damages. This appeal followed.

## II

The defendant argues that the trial judge incorrectly allocated the burden of proof when he instructed the jury on the issue of Painter's motive for terminating Nekolny, reducing Dahms' salary, and abolishing Dumas' position. The special interrogatory submitted to the jury was in two parts. It first required a finding that

a motivating factor [in the termination of the respective plaintiff's employment] was the work the plaintiff performed in the campaign of the defendant's opponent and against the defendant. (On *this* question, the *Plaintiff* has the burden of proof.)

(emphasis in original.)

The form continued:

If your answer to question No. 1 is "Yes" then answer question No. 2.

The second question asked whether the defendant would have taken the same action

> even if [the plaintiff] had not worked in McCullom's campaign: (On *this* question, the *Defendant* has the burden of proof).

(emphasis in original.)

The special interrogatory thus assigned each plaintiff the burden of proving that his or her campaign activities were a motivating factor in Painter's action. If the plaintiff succeeded, the burden of proof shifted to the defendant to prove that the defendant would have taken the same action with regard to the plaintiff's employment though he or she had not campaigned against the defendant.

According to the defendant, the proper allocation would have required proof that the sole reason for the defendant's unfavorable action was the campaign activities on behalf of Painter's opponent. Moreover, in the defendant's view the burden of proof should have rested entirely on the plaintiffs. It is argued that such an allocation was made in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), in which the Supreme Court held that employees of the Cook County Sheriff's office could not be discharged solely because of their partisan political affiliation. In *Elrod*, however, unlike the instant case, the issue of the motive for the firings was not disputed. There the defendant conceded that the employees were terminated because they were not Democrats. Thus the Court did not confront the issue of allocating the burden of proof on the motivation issue. Instead the question was whether a complaint alleging firings solely for partisan political reasons stated a First Amendment claim, and the Court held that it did. The similarity between our case and *Elrod* is that in both cases the plaintiffs alleged termination of their employment for political reasons in the context of an election. In our case, however, the defendant hotly contested plaintiffs' allegations that the terminations were political.

Because we are in this case faced with a dispute as to the motive for a termination of employment allegedly for conduct protected by the First Amendment, our case is similar to *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). There a non-tenured teacher was not rehired allegedly for exercising his First Amendment rights. In *Mount Healthy*, the defendant School Board had stated that one of the two reasons for not rehiring the plaintiff was conduct found by the district court to be "clearly protected by the First Amendment." The district court held that because that reason had played a "substantial part" in the Board's decision, the plaintiff was entitled to reinstatement with back pay. The Court of Appeals affirmed. The Supreme Court vacated the judgment and remanded for a determination made according to what it held to be the proper allocation of the burden of proof:

> Initially in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted).

The *Mount Healthy* test was used by the trial judge in the instant case. Each plaintiff had the burden of proving that the protected conduct was a "motivating factor" in the action taken against him before the burden shifted to the defendant to prove that the termination would have occurred even if that plaintiff had not worked for the election of the defendant's opponent. In our view, that allocation was proper.

We must reject the defendant's suggestion that we adopt a "sole motive" test in the case of terminations of employment after a change of administration following an election. To require that the plaintiff prove that the protected conduct was the "sole motive" for his termination would in our view run the risk of not adequately protecting victims of First Amendment violations. One can scarcely imagine an employee about whom an employer could not find some other dissatisfaction apart from that employee's protected conduct. The claim of a public employee who was terminated in fact for protected conduct could too easily be defeated because his employer asserted a convincing but nonmotivating reason for the discharge. The *Mount Healthy* test allows a defendant to terminate an employee for any legitimate reason, even where, as in *Mount Healthy* itself, a reason violative of the First Amendment was also a substantial or motivating factor in the decision. It should also be noted that the plaintiff has the initial burden of proving by a preponderance of the evidence[1] that the protected conduct was a "substantial" or "motivating" factor. That burden is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election.

In this case, the evidence showed that James Hickey, the defendant's liasan to the Senior Citizens' Bus Service and later the Senior Citizens' Coordinator, told Nekolny and Dahms that Painter wanted to terminate their employment because they had worked against her election. Plaintiff Dahms testified that Hickey said Dumas was out of a job for the same reason. It was not disputed that Painter had pledged in her campaign to abolish Dumas' job if she was elected. Nevertheless Dumas did not concede that his job was ultimately abolished but argued that it was resurrected in a somewhat altered form for Hickey who had worked in Painter's campaign. Although Hickey's reduced salary is evidence tending to support the defendant's position that Dumas was terminated for reasons having to do with the goals of the new administration, there was sufficient evidence that Dumas was terminated because he campaigned against Painter to allow that issue to go to the jury. We cannot say

---

1. The defendant contends that the trial court erred when it instructed the jury that plaintiffs' burden was to prove their case by a preponderance of the evidence. Painter relies on Judge Campbell's concurrence in *Illinois State Employees Union v. Lewis*, 473 F.2d 561, 579 (7th Cir. 1972), *cert. denied* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973) in which he stated his view that in political discharge cases the burden should remain on the discharged employee to "demonstrate by the clear and convincing weight of the evidence that his dismissal resulted solely because of his political associations."

The *Mount Healthy* decision does not require the plaintiff to prove illegal motivation by clear and convincing evidence, and we have already noted that the test there established does not require that the illegal reason be the sole motive. The defendant argues, however, that a proper concern that government officials not be harassed by vexatious lawsuits brought in the context of changes in administration mandates a heavier burden than in other First Amendment discharge cases. We decline to adopt the defendant's suggestion. Rather we agree with then-Judge Stevens who addressed that concern in *Lewis*:

> If a government department is, in fact, managed on a nonpolitical basis, there is little likelihood that litigation alleging that dismissals were politically motivated would seriously hamper the administration of government. . . . The price which a government must pay to protect the constitutional liberties of its employees is some loss of the efficiency enjoyed by private employers; the Supreme Court has repeatedly decided that the value of those individual liberties is well worth the cost.
>
> That cost will loom large only if it is assumed that political considerations will motivate a large number of employment decisions. . . . But to the extent employment decisions are based on political considerations, they involve a factor not normally present in the private sector; the tendency of that factor quite clearly is in the direction of less, rather than more, efficiency.

473 F.2d at 575.

as a matter of law that there was no violation of Dumas' First Amendment rights.[2]

## III

■ The defendant also challenges the directed verdict entered in favor of plaintiff Dumas on the issue of whether Dumas was a policymaker and thus excepted from the prohibitions of *Elrod v. Burns.* Here we agree with the defendant and conclude that the trial judge erred in deciding as a matter of law that Dumas did not occupy a policymaking position.

The policymaking exception was discussed by this court in *Illinois State Employees Union v. Lewis*, 473 F.2d 561 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). Then-Judge Stevens stated:

> Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making (sic) officials. Moreover, considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions.... [J]ustification is a matter of proof or at least argument, directed at particular kinds of jobs.

473 F.2d at 574.

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Justice Brennan writing for a plurality of the Court, agreed with the *Lewis* distinction between policymaking and non-policymaking employees:

> A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate.... Limiting patronage dismissals

to policymaking positions is sufficient to achieve this governmental end. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position.... [C]onsideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus, the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." *Illinois State Employees Union v. Lewis*, 473 F.2d at 574. Since, as we have noted, it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent.

427 U.S. at 367–68, 96 S.Ct. at 2687.

Recently the Supreme Court, in upholding a determination that assistant public defenders were not policymakers and thus could not be fired for their political beliefs, noted:

> [T]he ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980).

■ The determination of status as a policymaker in many cases presents a difficult factual question. *Rosenthal v. Rizzo*, 555 F.2d 390 (3d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977). We are persuaded that the defendant has here presented sufficient evidence from which a reasonable juror could conclude that Dumas' position was within the policymaking exception. A narrow definition of who is a

2. There is no merit to the defendant's contention that the verdicts were against the manifest weight of the evidence. Our review of the record reveals sufficient evidence on which the jury could base its findings. Although much of

plaintiffs' evidence was controverted by the defendant, issues of credibility are for the jury to decide. *Hampton v. Hanrahan*, 600 F.2d 600, 625 (7th Cir. 1979).

policymaker necessarily increases the chances of "undercut[ting] . . . the implementation of the policies of the new administration, policies presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687. That ability of the government to implement the will of the people is fundamental to our system of representative democracy. We recognize that policymaking and policy implementation may occur at many levels, even within a particular office whose sphere of authority is narrowly circumscribed. The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.

That standard must be applied to Dumas, the ex-Senior Citizens' Coordinator of Lyons Township. His functions included conducting feasibility studies and other research concerning the nature and extent of programs for senior citizens. His proposals were directed to the Township Supervisor and the Board of Auditors. One program to help temporarily handicapped senior citizens was implemented by the prior administration at Dumas' recommendation and was abolished when Painter was elected Supervisor. Dumas was one of the four highest paid employees in the Township, tending to signify a position of some influence. That he did not have final decisionmaking authority is not determinative. *See Indiana State Employers Assoc., Inc. v. Negley*, 365 F.Supp. 225 (S.D.Ind.1973), *aff'd*, 501 F.2d 1239 (7th Cir. 1974). There was, in short, evidence from which a reasonable juror could conclude that the Senior Citizens' Coordinator had meaningful input into decisionmaking concerning the nature and scope of a major township program. Therefore it was for the trier of fact to determine whether Dumas was a policymaker. The district court erred in directing a verdict on that issue.

## IV

■ The defendant next argues that she is immune from liability individually and is liable, if at all, only in her official capacity. The plaintiffs sued Painter both individually and as Supervisor of Lyons Township. Official-capacity suits, the Supreme Court has stated, "generally represent only another way of pleading an action against an entity of which an officer is an agent. . . ." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035 n.55, 56 L.Ed.2d 611 (1978). In *Monell* the Court, overruling *Monroe v. Pape*, 365 U.S. 167, 151 S.Ct. 473, 5 L.Ed.2d 492 (1961), held that local governments were "persons" and thus suable under § 1983. Damages sought from government officers in their official capacity had before *Monell* often been barred as "subterfuges that contravene the exemption from § 1983 announced in *Monroe* [for municipalities]." *Muzquiz v. City of San Antonio*, 528 F.2d 499 (5th Cir. 1976) (en banc) (adopting in pertinent part 520 F.2d 1002, 1009 (Godbold, J., dissenting)); *see generally* Nahmod, Civil Rights & Civil Liberties Litigation at § 6.04.

Here plaintiffs sued Painter individually in order to be able to collect damages from Painter herself and thus establish that Township funds were not their only source of relief. Now that *Monell* allows municipalities to be sued in their own name, recovery from the public treasury is possible in cases of government officials being sued in their official capacity. Defendant incorrectly leaps to the conclusion, however, that therefore only an official capacity and not an individual suit is appropriate here. We see no reason to assume on the basis of *Monell* that the law of individual liability has changed. We are unpersuaded that the district court should have immunized Painter from individual liability in this action.

■ Painter also contends that the trial judge erroneously failed to grant her qualified immunity. We do not agree. To be entitled to the special exemption from § 1983 liability provided by the doctrine of qualified immunity, Painter

> must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, un-

questioned constitutional rights of [her employees].

*Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975).

She is not immune from liability if she knew or reasonably should have known that the action [she] took within [her] sphere of official responsibility would violate the constitutional rights of [those] affected, or if [she] took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiff].

*Id.*

Without reaching the issue of her subjective intent we conclude that the trial judge properly determined that Painter knew or should have known that her actions were constitutionally infirm. The jury found that the termination of each plaintiff's employment was politically motivated, in violation of that plaintiff's First Amendment rights. It is clear that the law was not unsettled on this point. In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court had expressly forbidden political firings following an election, and in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court held that the presence of both permissible and impermissible motives did not legalize a termination that would not have occurred but for the existence of conduct protected by the First Amendment. Qualified immunity was not available to the defendant here.

## V

The defendant alleges that the trial court erred in admitting testimony as to statements allegedly made by James Hickey concerning the defendant's state of mind.[3] Testimony as to Hickey's statements was allowed as admissions against the defendant by her agent. Painter argues that those statements should not have been admitted because Hickey did not have authority to say either what he did or anything else concerning the plaintiffs' employment.

■ Admissibility in this instance is controlled by Rule 801(d)(2)(D) of the Federal Rules of Evidence, which provides:

A statement is not hearsay if ... [it] is offered against a party and is ... a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship....

We cannot say that the trial judge erred in concluding that Hickey was Painter's agent and that his statements concerned "a matter within the scope of his agency or employment." Rule 801(d)(2)(C), unlike 801(d)(2)(D), requires that a statement be "by a person authorized by him to make a statement concerning the subject." Rule 801(d)(2)(D), however, says nothing about an agent having authority to make a statement on a particular subject. After the fact of the agency is established, Rule 801(d)(2)(D) requires only that the statement "concern a matter within the scope of [the] agency or employment." *Northern Oil Co., Inc. v. Socony Motor Oil Co., Inc.*, 347 F.2d 81 (2d Cir. 1965), cited by the defendant for the proposition that the agent must have authority to make statements in a given area, was decided before the enactment of Rule 801(d)(2)(D). In fact, *Northern Oil* was referred to in the Advisory Committee Notes to Rule 801(d)(2)(D) as an example of the older and more narrow view not favored by the Com-

---

**3.** Plaintiff Nekolny testified that Hickey told him, "You know I tried to talk to Ann Painter. I tried to save your job for you, but the way you and your wife worked in the campaign I can't do anything with Ann Painter. You are being fired." Plaintiff Dahms also testified to hearing Hickey make those statements. Moreover, in a separate meeting with Hickey, Dahms testified that Hickey said "Mrs. Painter was very upset with all of us. She was a very vindictive person and was set on cleaning house and getting rid of everyone that campaigned against her." Dahms also testified that Hickey said he was Painter's "personal hatchet man," that Hickey suggested Dahms was also "going" for campaigning against Painter, and stated that Painter had not "figured out how she was going to get rid of me yet."

mittee. Notes of Advisory Committee on Proposed Rules (*reprinted in* Fed.Rules Evid. Rule 801, 28 U.S.C.A.). Rule 801(d)(2)(D) takes the broader view that an agent or servant who speaks on any matter within the scope of his agency or employment during the existence of that relationship, is unlikely to make statements damaging to his principal or employer unless those statements are true.

Here Painter herself testified that Hickey was her "liaison' and "advisor" to the senior citizens program, in which all three plaintiffs were employed. Painter acknowledged that she met with Hickey "almost every day." Painter stated that she and Hickey had interviewed Dahms for the job, that she and Hickey had discussed Dahms' work, that Hickey had recommended to her that Dahms' work load be reduced, and that she had directed Hickey to communicate news of the reduction to Dahms. Hickey, who had previously investigated and reported to Painter on Nekolny's health and job performance, was charged by Painter with delivery of the letter terminating his employment as well. Painter also conceded that she herself had had almost no contact with any of the plaintiffs. In her brief, Painter argues that an agency cannot be established by the statements of the agent alone. In this case, however, the principal's own testimony establishes the fact and the scope of the agency relationship sufficiently to make the disputed statements admissible.[4]

It is clear to us, as it was to the plaintiffs, that Hickey was speaking of a matter within the scope of his agency or employment when he discussed with Dahms and Nekolny the reasons for the decisions concerning their employment.

---

**4.** Although we need not rely on Hickey's testimony, we note that the

> broadly stated proposition that the authority of an agent cannot be proved "out of the mouth of the agent" is true only if it is considered with its numerous exceptions. . . . For example, when made in court under oath, subject to the tests of cross examination and penalties of perjury, those circumstances are

## VI

Finally, the defendant argues for reversal on the damages awarded for emotional and mental distress. We agree that there was insufficient evidence of injury to support the award.

Although mental and emotional distress caused by the denial of First Amendment rights is compensable, an award of damages for such injury will not stand without proof that such injury actually was caused. *See Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). The only evidence of injury contained in this record was Nekolny's testimony that on learning he was terminated he was "very depressed," Dahms' statement that she was at one point subsequent to leaving her job "a little despondent and [lacking] motivation," and Dumas' testimony, on being asked whether he looked for employment after losing his job, "Well, I didn't work for six weeks, I was completely humiliated, and I stayed close to home."

That evidence is insufficient to constitute proof of compensable mental or emotional injury.

> Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury.

*Carey v. Piphus*, 435 U.S. at 264 n.20, 98 S.Ct. at 1052 n.20 (citation omitted).

A single statement by a party that he was "depressed," "a little despondent," or even "completely humiliated" (the latter in the context of explaining why other employment was not sought), is not enough to

> regarded as making the statement sufficiently trustworthy to be received.

*Murphy Auto Parts Co. v. Ball*, 249 F.2d 508, 510 (D.C.Cir.1957), *cert. denied*, 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958). Hickey's testimony about his job responsibilities and the testimony of the plaintiffs reinforce our conclusion.

establish injury even when the statement is considered along with the facts of this case. The circumstances here do not approach the egregiousness of those found in *Seaton v. Sky Realty Company, Inc.*, 491 F.2d 634 (7th Cir. 1974).

Although at one point the trial judge decided that he would not permit evidence on the issue of emotional injury, plaintiffs' counsel did not make an offer of proof according to Federal Rule of Evidence 103(a)(2). Moreover, counsel did not offer to present further evidence when the judge later reversed his position and decided to allow the jury to award damages on this issue. According to the record presented here, plaintiffs were not entitled to damages for emotional injury and the award of those damages must be reversed.

## VII

The judgments in favor of Nekolny and Dahms are affirmed except for that portion of the damage award attributable to mental and emotional distress. Because a directed verdict was erroneously entered on the issue of whether plaintiff Dumas was a policymaker, we vacate the judgment and remand for a determination on that issue by the trier of fact. In the event Dumas is found not to be a policymaker, he is entitled to all damages except those attributable to mental and emotional distress.

CUDAHY, Circuit Judge, concurring:

I agree that *Mount Healthy* compels us to shift the burden of persuasion to the defendant once the plaintiffs have made a prima facie showing that political activity was a "motivating factor" in the discharges. As a matter of good policy, however, it is unclear to me why the analysis of *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) should not be equally appropriate here. In *Burdine*, a Title VII case, the Court held that the ultimate burden of persuasion "remains at all time with the plaintiff," although once the plaintiff has proved a prima facie case of discrimination, the defendant bears the intermediate burden of "producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* 450 U.S. at 254, 101 S.Ct. at 1094.

Although it is a leading decision involving the First Amendment rights of government employees, *Mount Healthy* did not address allegedly partisan political terminations in the framework of an election, where the reasonable prerogatives of the candidates returned by the voters must be weighed in the balance. In addition, successful candidates may be assigned the ultimate burden of proving the propriety of wholly meritorious firings. While the result in the case before us does not seem inappropriate, I am concerned that, in the context of allegedly partisan discharges of defeated campaigners, the broad sweep of the *Mount Healthy* analysis may create undesirable pitfalls for successful candidates.